1999-NMCA-032

976 P.2d 1019

Manuel CHAVARRIA, Worker–Appellant,

v.

BASIN MOVING & STORAGE and
New Mexico Mutual Casualty Co.,
Employer/Insurer–Appellees.

No. 18,704.

Court of Appeals of New Mexico.

Jan. 20, 1999.

68

Victor A. Titus, Titus & Murphy, Farming-ton, for Appellant.

Richard J. Shane, Margaret Caffey–Mo-quin, Riley, Shane & Hale, P.A., Albuquer-que, for Appellees.

## OPINION

WECHSLER, Judge.

{1} Manuel Chavarria (Worker) appeals the decision of the Workers' Compensation Judge (WCJ) awarding him benefits based on an impairment rating of 5%. Worker chal-lenges: (1) the assigned impairment rating for Worker's back injury; (2) the WCJ's refusal to assign impairment ratings for psy-chological disorder and chronic pain; (3) the WCJ's findings allowing reduction of the compensation benefits for reasons of injuri-ous practices; and (4) the WCJ's exclusion of the testimony of one of Worker's expert wit-nesses. For the reasons discussed below, we reverse the WCJ's decision and remand for further proceedings.

### Facts

{2} Worker suffered a lower back injury in August 1993 while employed at Basin Moving & Storage (Employer). Dr. Peter Saltzman, an orthopedic surgeon and Work-er's treating physician, operated on Worker to repair a herniated disc on February 24, 1994. Dr. Saltzman performed a fusion of

the area and inserted permanent metal instrumentation. Worker initially did well following the operation, noting decreased pain. Several months after the surgery, however, Worker complained of renewed and increased pain in his lower back and left leg. In late 1994 and early 1995, doctors took x-rays and performed several other tests which revealed no obvious problems or evidence of acute or chronic radiculopathy (disease of the spinal nerve roots) or other nerve injury.

{3} Dr. Saltzman referred Worker to Dr. Robert Sherrill, a clinical psychologist, for a psychological study to determine whether there was a stress component to Worker's symptoms. Dr. Sherrill examined Worker on March 13, 1995 and concluded that Worker suffered from a mood disorder, pain disorder, and mixed neuroses, and that he was not a malingerer. He additionally concluded that psychological issues were affecting Worker's physical recovery, and recommended conservative medical intervention (no additional surgery or invasive procedures) and antidepressants. Dr. Saltzman rejected Dr. Sherrill's recommendation and performed a second operation on March 25, 1995. At that time, Dr. Saltzman removed the instrumentation inserted during the 1994 surgery and a bone spur. In April 1996, at the request of Dr. Anthony Chiodo, one of Worker's treating physicians, Dr. Sherrill examined Worker again following the second operation. After that examination, Dr. Sherrill reached the same conclusions he had made after his first examination of Worker.

{4} Following the second operation, Dr. Saltzman referred Worker to Dr. Glen Kelley, a rehabilitation physician, for an evaluation and an impairment rating. On August 15, 1995, Dr. Kelley determined that Worker had a lumbar injury requiring fusion resulting in radiculopathy, and had reached maximum medical improvement (MMI). Dr. Kelley concluded that Worker had a 25% whole-person impairment relying on Table 72 of the American Medical Association, *Guides to the Evaluation of Permanent Impairment* § 3.3g, at 3/10 (4th ed. 1993) (*AMA Guides*). Dr. Saltzman agreed with this assessment. Dr. Kelley had also examined and performed nerve and motor tests on Worker at Dr.

Saltzman's request prior to Worker's second surgery. His findings from these tests were normal.

{5} After the second operation Dr. Saltzman also referred Worker to Dr. Keith Harvie, a psychiatrist, and Dr. Michael Dempsey, a board certified psychiatrist, for an independent medical evaluation. They concluded that Worker had reached MMI on October 3, 1995, and also assigned Worker an impairment rating of 25%. Dr. Dempsey stated that he and Dr. Harvie took psychological injury and chronic pain into account when they assigned the impairment rating. Dr. Dempsey testified that the reason Worker was not doing better was due to his "subjective complaint of pain and weakness for which there's no real strong evidence." Dr. Dempsey believed that the 25% impairment rating as assessed by Dr. Harvie was reached by evaluating the chronic pain issues that he had considered in his psychological evaluation.

{6} Dr. Chiodo, board certified in physical medicine and rehabilitation, examined Worker once following his first operation on March 13, 1995, and later treated Worker from April 1996 to October 1996 at Dr. Saltzman's request. Dr. Chiodo testified that his first examination was for purposes of providing information to the New Mexico Disability Determination Unit to evaluate Worker's claim for state disability benefits. He could find no physical or neurological reason for Worker's minor physical weakness or pain. He thought that the degree of functional loss experienced by Worker was out of proportion with the objective findings from both diagnostic tests and the physical examination.

{7} Dr. Chiodo agreed with Dr. Kelley that Worker reached MMI on August 15, 1995, but he did not agree with Dr. Kelley that Worker should be assigned an impairment rating of 25%. He testified that there was no documentation in Dr. Saltzman's notes which indicated that Worker had motion segment instability. Dr. Chiodo also found radicular signs but did not find in the notes or documents in Worker's medical record that Worker had true radiculopathy—sensory, reflex, and motor loss. He stated that true radiculopathy is based upon find-

ings of "[p]inprick loss, strength loss, and reflex loss within the nerve root distribution consistent with ... radiological findings ... or EMG documentation of radiculopathy."

{8} Dr. Chiodo testified that he did not know the appropriate impairment category under the *AMA Guides* in which to place Worker because he did not have all of the information from preoperative evaluations and could not say whether Worker met the criteria for radiculopathy. He believed that if Worker did not meet the criteria for radiculopathy he could be classified as low as a 5% impairment rating based upon the *AMA Guides*. However, if Worker did meet the criteria for radiculopathy, Dr. Chiodo was of the opinion that the appropriate impairment rating would be 10%, because he did not find any documentation of loss of motion segment integrity. He did find that Worker has sustained "significant functional loss," and that this could cause loss of self-esteem and psychological problems.

{9} Dr. Chiodo additionally testified that Worker's reliance on a back brace had further limited Worker's mobility and that Worker's use of a cane contributed to the worsening of his pain. He did not find any objective need for either the cane or the brace. Although, he also testified that Worker met the *AMA Guides* criteria for chronic pain, he noted that additional impairment is added for chronic pain only if "chronic pain symptoms aren't taken up by the specific injury." In this case, he stated that the *AMA Guides* account for chronic pain in the impairment rating for the specific injury. Dr. Saltzman agreed, stating that the 25% impairment rating assigned by Dr. Kelley included a rating for chronic pain.

{10} The WCJ determined that the medical evidence did not support the 25% impairment rating assigned by Dr. Kelley, Dr. Harvie, and Dr. Dempsey. The WCJ found that there was no physical evidence of radiculopathy to support the impairment rating, that Dr. Chiodo appropriately assessed Worker's impairment rating at 5%, and that Worker was not a credible witness noting that Worker's physical movements during the hearing were inconsistent with his testimony. The WCJ further found that "Worker's continued use of his cane and back brace despite his treating physician's repeated instructions to stop using such devices, has impeded and caused Worker's disability to worsen and increase." The WCJ concluded that Worker's conduct constituted injurious practices and, therefore, Employer was entitled to a reduction in the compensation award under NMSA 1978, § 52-1-51(I) (1990). The WCJ stated that the permanent partial disability determination reflected a reduction of benefits pursuant to Section 52-1-51(I).

*Does Substantial Evidence Support the WCJ's Conclusion of the Impairment Rating?*

{11} We review the whole record to determine if the WCJ's assessment of a 5% impairment rating is supported by substantial evidence. *See Valdez v. Wal-Mart Stores, Inc.*, 1998-NMCA-030, ¶ 22, 124 N.M. 655, 954 P.2d 87. In reviewing worker's compensation administrative decisions, the appellate court canvasses the evidence to determine whether there is substantial evidence to support the WCJ's decision. *See Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 128, 767 P.2d 363, 367 (Ct.App. 1988). We review "all the evidence bearing on a finding or decision, favorable and unfavorable, in order to determine if there is substantial evidence to support the result. We analyze and examine all the evidence and disregard that which has little or no worth." *Id.*

{12} Dr. Kelley, Dr. Dempsey, and Dr. Harvie assigned to Worker an impairment rating of 25%. Dr. Saltzman agreed with their assessments. As indicated in Dr. Kelley's report, this impairment rating was based on the fact that Worker's original injury resulted in radiculopathy and loss of motion integrity that was treated by surgery.

{13} Dr. Chiodo, on the other hand, testified that the impairment rating should be 5% if Worker did not meet the radiculopathy criteria, and 10% if Worker did meet the radiculopathy criteria. Dr. Chiodo stated that he did not have sufficient information from Worker's preoperative evaluations to determine whether Worker met the criteria for radiculopathy. Dr. Chiodo was not sure

that he would agree with the 25% impairment rating assigned by Dr. Kelley because, in reviewing Worker's previous medical records, he could find no documentation that Worker had motion segment instability or true radiculopathy.

{14} Although the grounds for the WCJ's 5% impairment rating are unclear, the WCJ's decision appears to be based upon one of three possibilities. First, the WCJ may have focused only on the symptoms that Worker was experiencing following his surgeries. The WCJ cited to tests conducted following the first surgery which revealed no evidence of acute or chronic radiculopathy. Second, the WCJ may have relied on testimony by Dr. Chiodo that he found no evidence of any preoperative true radiculopathy or motion segment instability during his examination of Worker's medical records. Third, the WCJ may have believed that Worker had a greater impairment rating, but reduced the rating to 5% because of her finding of Worker's injurious practices based upon Worker's refusal to stop using the back brace and cane. We address each possibility below.

**1.** *Reliance on Postoperative Symptoms*

{15} According to NMSA 1978, § 52–1–24(A) (1990), an impairment is "an anatomical or functional abnormality existing after the date of maximum medical improvement as determined by a medically or scientifically demonstrable finding and based upon the most recent edition" of the *AMA Guides.* The parties do not dispute that in order to assess Worker's impairment rating the Injury Model of the *AMA Guides* should be used. *See AMA Guides* § 3.3, at 3/94. Under the Injury Model, lumbosacral spine (lower spine) impairments as experienced by Worker are described in terms of diagnosis-related estimates (DREs), and the DRE level corresponds to a percentage impairment rating. *See id.* § 3.3b, at 3/95. "With the Injury Model, surgery to treat an impairment does not modify the original impairment estimate, which remains the same in spite of any changes in signs or symptoms that may follow the surgery and irrespective of whether the patient has a favorable or unfavorable response to treatment." *Id.* § 3.3d, at 3/100.

{16} The *AMA Guides* further clarify use of the Injury Model by an illustrative example. *See id.* § 3.3g, at 3/103. In the example, a woman with signs of radiculopathy underwent disk removal and spinal fusion, which caused her symptoms to recede. Nevertheless, the proper impairment rating was 10% despite the resolution of the symptoms because the resolution of symptoms following a surgical procedure does not reduce the impairment rating estimate. We interpret this example to mean that the impairment rating that is applicable prior to surgery does not change as a result of a worker having undergone surgery, regardless of the results.

{17} To the extent that Employer argues that this provision of the *AMA Guides* conflicts with our statutory definition for impairment, we disagree. Under our statute, impairment is assessed after the MMI date by use of the *AMA Guides* and the *AMA Guides* dictate that, in cases involving lower spine impairment, the original impairment estimate rating is not altered by the fact that a claimant has undergone surgery. When the language of the statute is clear, as in this case, we give effect to the language. *See Chavez v. Mountain States Constructors,* 1996–NMSC–070, ¶ 23, 122 N.M. 579, 929 P.2d 971. Nor do we believe that we are applying the *AMA Guides* too rigidly. *Cf. Madrid v. St. Joseph Hosp.,* 1996–NMSC–064, ¶ 19, 122 N.M. 524, 928 P.2d 250 (noting that *AMA Guides* provide a general framework and not a rigid formula that must be followed). Use of the Injury Model, which both parties agreed applied in this case, provides very specific and clear guidance as to how an impairment rating is assessed.

{18} Under the Injury Model, lower spine-related complaints in DRE Category II involve mild spine function impairment while those in DRE Categories III through V relate to documentable findings that are more serious such as radiculopathy and loss of motion segment integrity. *See AMA Guides* § 3.3g, at 3/102 – 3/103. For example, DRE Category II involves minor impairment with no objective sign of radiculopathy and no loss of structural integrity; DRE Category III

involves the presence of radiculopathy; DRE Category IV involves the loss of motion segment integrity; and DRE Category V involves both radiculopathy and loss of motion segment integrity. *See id.* § 3.3g, at 102 and ⁹⁄₁₀, Table 72. The impairment rating assigned for DRE Category II is 5%; DRE Category III is 10%; DRE Category IV is 20%; and DRE Category V is 25%.

{19} From her findings, it appears the WCJ may have relied upon postoperative test results in concluding that there was no physical evidence of radiculopathy. The WCJ made findings that no valid medical testing supports Worker's radiculopathy complaints. As discussed above, assigning the rating based upon postoperative conditions is not consistent with the *AMA Guides*.

### 2. *Reliance Exclusively on Dr. Chiodo's Testimony*

■ {20}⋆ Alternatively, the WCJ may have correctly focused on Worker's preoperative condition, and based her finding exclusively on Dr. Chiodo's opinion. Dr. Chiodo, however, did not testify that Worker had a 5% impairment rating. He could not because, as we have discussed, to reach that conclusion, the opining doctor would need to conclude that Worker did not have preoperative radiculopathy. Dr. Chiodo did not see Worker preoperatively. To testify concerning impairment ratings Dr. Chiodo relied upon Worker's medical records for preoperative information. Although he could not find evidence of radiculopathy in the records he reviewed, he could not testify that Worker fell within DRE Category II (5% impairment rating) as distinguished from DRE Category III (10% impairment rating) because he did not have all the information from Worker's preoperative evaluations. Other doctors, including Dr. Saltzman, stated that there was evidence of preoperative radiculopathy. In reviewing "all the evidence bearing on a finding or decision, favorable and unfavorable" for our whole record review, *Tallman*, 108 N.M. at 128, 767 P.2d at 367, we consider whether an expert has available all the pertinent underlying facts necessary to form an opinion, *see Martinez v. Southwest Landfills,* *Inc.,* 115 N.M. 181, 185, 848 P.2d 1108, 1112 (Ct.App.1993).

{21} Employer argues that the WCJ had ample evidence other than Dr. Chiodo's testimony upon which to base her finding. But this evidence was of postoperative findings. Moreover, the WCJ specifically found that "Worker has a whole body impairment rating of 5% as assessed by Dr. Chiodo." However, as noted above, Dr. Chiodo did not make such an assessment. *See Tafoya v. Casa Vieja, Inc.,* 104 N.M. 775, 776, 727 P.2d 83, 84 (Ct.App.1986) (inferences must be legitimately drawn from evidence presented).

### 3. *Reduction in Impairment for Injurious Practices*

■ {22} Finally, the WCJ may have found a 5% impairment rating based upon a reduction for injurious practices. The WCJ concluded that Worker's use of a back brace and cane constituted injurious practices under Section 52–1–51(I). The WCJ further concluded that these injurious practices entitled Employer to a reduction in the partial permanent disability award, and that the compensation order "reflects a reduction of permanent partial disability benefits," but did not indicate how the WCJ reduced the award. The only variable in the benefits equation the WCJ used was the determination of Worker's impairment rating.

{23} Worker alleges that the WCJ erred in finding injurious practices and that her reduction of impairment rating because of Worker's alleged injurious practices was not in accordance with the statute. Section 52–1–51(I) states:

> If any worker persists in any unsanitary or injurious practice that tends to imperil, retard or impair his recovery or increase his disability or refuses to submit to such medical or surgical treatment as is reasonably essential to promote his recovery, the workers' compensation judge may in his discretion reduce or suspend the workers' compensation benefits.

The WCJ made findings that Worker persisted in using a back brace and cane postoperatively despite recommendations from Dr. Saltzman and other treating physicians that he discontinue using the devices because

they were counterproductive to his overall improvement. The WCJ found that Dr. Saltzman believed that Worker's continued use of the back brace added to Worker's lack of functional ability. Substantial evidence supports the WCJ's conclusion that Worker persisted in injurious practices which retarded or impaired his recovery. As a result, it was within the WCJ's discretion to reduce or suspend benefits.

█ {24} However, the WCJ's findings do not state how or in what proportion the WCJ reduced the award. Because the impairment rating was the only issue in the case that affected benefits, it appears, therefore, that the WCJ may have applied Section 52–1–51(I) by assigning the 5% impairment rating that Dr. Chiodo said would be proper if Worker did not have true radiculopathy even though the evidence did not extend as far as that position. Section 52–1–51(I) does not work in this manner. The findings of impairment and injurious practices are exclusive of one another.

█ {25} Although the WCJ does have some discretion in assigning an impairment rating, it is not unfettered. *See Yeager v. St. Vincent Hosp.*, 1999–NMCA–020, ¶ 13, 126 N.M. 598, 973 P.2d 850. The "WCJ may choose between experts' conflicting opinions of a worker's impairment rating," and may adjust an impairment rating when evidence casts doubt on the worker's reports of pain. *Id.; see* § 52–1–24(A) (defining impairment). Finding injurious practices under Section 52–1–51(I) gives the WCJ discretion to reduce or suspend benefits only; it does not allow the WCJ to reduce the impairment rating. The WCJ must make separate findings, one as to impairment rating, and another as to reducing the level or suspending benefits when applying Section 52–1–51(I). *Cf. Martinez v. Zia Co.*, 99 N.M. 80, 81–82, 653 P.2d 1226, 1227–28 (Ct.App.1982) (reversing reduction of disability from 100% to 25% possibly for injurious practices as not supported by findings where finding did not make it clear why 25% rating was assigned (decided under previous workers' compensation system)).

{26} Further, separate findings comport with the intent of Section 52–1–51(I) reduc-

ing or suspending Worker's benefits based upon injurious practices. This subsection appears to address Worker's conduct affecting his future health and employability. The reduction or suspension is made at the WCJ's discretion and places some responsibility on Worker for his own health and medical treatment. In this case, the assigned impairment rating is based upon the preoperative condition of Worker. It would be illogical to reduce an impairment rating based upon Worker's postoperative conduct.

{27} The WCJ did not make separate findings in this case as to impairment and reduction. We remand for entry of new findings as to impairment and injurious practices based on the existing record.

*The WCJ's Exclusion of Dr. Sherrill's Testimony*

█ {28} The WCJ found the testimony of Dr. Sherrill not credible because the WCJ reviewed testimony in which Dr. Sherrill stated he had met with Worker's attorney prior to his deposition and discussed with Worker's attorney psychological and legal issues relating to the deposition. The WCJ concluded that Dr. Sherrill had been inappropriately coached or encouraged in his testimony and his testimony would not be credible.

{29} During the deposition, Employer's attorney asked Dr. Sherrill about the meeting he had with Worker's attorney. Dr. Sherrill explained that he met with Worker's attorney approximately one week prior to the deposition. He stated that they discussed the emphases Worker's attorney planned to make during the deposition; that is pain disorder, generation of an impairment rating for pain disorder, and mood disorder. Dr. Sherrill further stated that Worker's attorney asked him to be familiar with the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.1994) and how the manual would apply to Worker.

█ {30} We fail to see how this interchange between Worker's attorney and one of Worker's medical providers constituted inappropriate coaching. An attorney is entitled to meet with and prepare his or her own

witness for a hearing. *See Pesch v. Bodding- ton Lumber Co.*, 1998–NMCA–026, ¶¶ 8–11, 124 N.M. 666, 954 P.2d 98; *cf. Church's Fried Chicken No. 1040 v. Hanson*, 114 N.M. 730, 734–35, 845 P.2d 824, 828–29 (Ct.App. 1992) (holding that ex parte communication between insurer and worker's treating physician resulted in proper exclusion of expert's testimony). There is no evidence that Worker's attorney specifically told Dr. Sherrill what to say or compromised Dr. Sherrill's independent medical conclusions. The WCJ erred by finding Dr. Sherrill's testimony not credible based on the ground that he was improperly coached.

*Lack of Substantial Evidence to Support a Psychological or Chronic Pain Impairment*

{31} Worker claims that the WCJ improperly failed to give separate impairment ratings based on Worker's allegations of a psychological disorder and chronic pain. Our reading of the *AMA Guides* indicates that, in particular circumstances, it is possible that certain disorders would rise to such a level that a separate impairment rating would be warranted for psychological disorder or chronic pain. *See AMA Guides* § 14.2, at 293–95; § 15, at 307–313.

{32} In this case, there was evidence that Worker did not suffer from either a psychological disorder or chronic pain. For example, the WCJ made certain observations that indicated that Worker's complaints of pain were not credible. The WCJ observed Worker during the hearing and noted that he had no difficulty moving from one position to another. The WCJ's findings included testimony from Dr. Dempsey that Worker was "capable of working from a psychological or psychiatric standpoint." Dr. Dempsey testified that Worker had some loss of function, but not an amount that would disable or impair a person so that he could not function socially or occupationally. According to Dr. Dempsey, Worker was eating well, and his mood and energy were good. Dr. Chiodo provided testimony that for this type of lower spine injury, the impairment rating accounted for chronic pain. Dr. Saltzman also believed the impairment rating included chronic pain.

{33} While this evidence appears sufficient to support the WCJ's findings, the improper exclusion of Dr. Sherrill's relevant testimony requires reversal on this issue. *See State ex rel. State Highway Comm'n v. Bassett*, 81 N.M. 345, 346, 467 P.2d 11, 12 (1970) ("If relevant and admissible, it would be reversible error for the court to refuse to accord [evidence] any weight which, in effect, would amount to its exclusion."). Dr. Sherrill testified at his deposition that Worker suffered from mood disorder and chronic pain. He assigned impairment categories under the *AMA Guides* for mental impairment and chronic pain, which he believed to be causally connected to Worker's work injury.

{34} We cannot say that if the WCJ had considered Dr. Sherrill's testimony, the WCJ would not have found that Worker was entitled to a separate impairment rating for mental impairment or chronic pain or both. Therefore, we remand for reconsideration from the existing record of separate impairment ratings based on psychological disorders and chronic pain, taking into consideration Dr. Sherrill's testimony, which the WCJ erroneously excluded.

*Conclusion*

{35} Based on the foregoing, we reverse the decision of the WCJ and remand for further proceedings in accordance with this opinion.

{36} **IT IS SO ORDERED.**

APODACA and ARMIJO, JJ., concur.