688 P.2d 25

**Betty Sue BROOKS, Plaintiff-Appellant and Cross-Appellee,**

v.

**HOBBS MUNICIPAL SCHOOLS and Employers National Insurance Company, Defendants-Appellees and Cross-Appellants.**

**Nos. 7582, 7587.**

Court of Appeals of New Mexico.

Aug. 16, 1984.

W. Gilbert Bryan, Bryan & Fischer, Hobbs, for plaintiff-appellant and cross-appellee.

J.W. Neal, Neal & Neal, Hobbs, Sasha Siemel, Sutin, Thayer & Browne, Albuquerque, for defendants-appellees and cross-appellants.

## OPINION

BIVINS, Judge

In this worker's compensation case plaintiff Brooks appeals from a judgment reducing her compensation benefits by 50% because of refusal to submit to medical or surgical treatment. Defendants cross-appeal the award of attorney fees on the basis that Brooks was unsuccessful. Because the defendants were voluntarily paying compensation benefits at the time they petitioned the trial court to terminate Brooks' benefits for refusal to submit to medical or surgical treatments, we requested counsel to brief the question as to whether the trial court had jurisdiction to entertain defendants' petition.

The issues presented raise questions of statutory construction under the Workmen's Compensation Act, NMSA 1978, §§ 52-1-1 to -69 (Orig.Pamp. and Cum. Supp.1984). The issues are:

(1) Did the trial court have jurisdiction to consider defendant's petition to terminate Brooks' benefits? If so,

(2) Did the trial court err in finding Brooks' refusal to submit to medical or surgical treatment unreasonable?

(3) Since Brooks suffered a reduction in benefits as a result of that refusal, can she nevertheless recover attorney fees?

We answer these issues by holding that the trial court did have jurisdiction, that it erred in finding Brooks' refusal to submit unreasonable, and because this holding justifies an award of attorney fees, we do not reach the third issue but remand for a hearing on attorney fees in light of Brooks' success on appeal.

## FACTS

Brooks suffered an injury to her lower back in February 1979, while working as a cook for defendant Hobbs Municipal Schools. In December 1980, pursuant to a stipulation, the trial court entered an order requiring that compensation be brought current from the date of the accident, and that Brooks submit to a myelogram and other necessary care by Dr. Maldonado.

The order dismissed Brooks' complaint without prejudice.

In February 1981, Brooks submitted to a myelogram which revealed a probable herniated disc at the L4–5 level. Dr. Maldonado recommended a diskectomy, which Brooks refused. She later saw Dr. Altman, an orthopedic surgeon in Albuquerque, who also offered Brooks medical treatment to relieve her pain. Dr. Altman suggested chemonucleolysis. Again Brooks refused. Defendants' motion to terminate benefits followed.

### 1. Jurisdiction.

At the time defendants filed their motion to terminate benefits, there was no pending action and no judgment determining disability and awarding future compensation to Brooks; only the order of dismissal filed in December 1980. Recognizing a potential problem, counsel for defendants brought the question of jurisdiction to the attention of the trial court as the first order of business at the hearing on the motion to terminate benefits. The parties stipulated and the trial court agreed that the hearing could proceed either as a reopening of the order of dismissal or as a complaint for declaratory judgment.

Because of this court's concern that the trial court may have lacked jurisdiction to reopen, see *Elwess v. Elwess*, 73 N.M. 400, 389 P.2d 7 (1964), we raised the question during the calendaring process on our own motion, see *Pacheco v. Pacheco*, 82 N.M. 486, 484 P.2d 328 (1971), and asked the parties to brief the issue. The parties complied and we are now satisfied the trial court did have jurisdiction to proceed as it did.

Although this court in *Glover v. Sherman Power Tongs*, 94 N.M. 587, 613 P.2d 729 (Ct.App.1980), held that, except in rare circumstances, any judgment for compensation in a worker's compensation case may be reopened during the remainder of the statutory period for the purpose of requesting an increase or decrease in compensation benefits, we do not rest our decision on that case. Unlike *Glover* there has never

been a prior judgment awarding future compensation or, for that matter, any determination of disability. Thus, NMSA 1978, § 52–1–56 does not apply here.

Nor do we base our decision on the Declaratory Judgment Act, NMSA 1978, §§ 44–6–1 to –15, although arguably that Act could be made to apply through NMSA 1978, Civ.P.R. 57 (Repl.Pamp.1980) and NMSA 1978, § 52–1–34.

■ We do not need to look beyond the worker's compensation act for authority. The parties argue, and we agree, that NMSA 1978, § 52–1–51, the statute under which Brooks' compensation was reduced, implicitly contemplates the very procedure followed in this case. Section 52–1–51 provides that an employer is entitled to require a physical examination of a claimant before or after a claim has been filed or an award of compensation made. If a worker refuses to submit to such medical or surgical treatment as is reasonably essential to promote his or her recovery, the court may in its discretion reduce or suspend compensation. *Id.* Implicit in this section is the jurisdiction of the district court to entertain defendants' motion to terminate compensation even though no claim for or award of future disability compensation was before the court. Section 52–1–56(A) provides that a district court "in which any workman has been awarded compensation" may order an increase, diminution, or termination of compensation based on changes in the claimant's condition. Had the legislature wished to put such language in Section 52–1–51, requiring that compensation have been awarded before a reduction may be made, it could easily have done so. It did not. The Workmen's Compensation Act must be construed liberally to give effect to its benevolent purpose in favor of the worker. *Glover.* To hold that the court has no jurisdiction under Section 52–1–51 until the worker has been forced to file a claim because the employer has reduced or terminated compensation would not be construing the act in favor of the worker.

As defendants state, their "decision to go to court rather than preemptorily reduce or terminate benefits to induce a claim by plaintiff accords with the spirit of the workmen's compensation act, and the court's power to hear that petition exists in the letter and spirit of that act." We commend defendants' actions and, by interpreting Section 52–1–51 as we do, encourage that practice.

We now turn to the merits of Brooks' appeal.

**2. Refusal of medical or surgical treatment.**

Section 52–1–51 provides in part:

If any workman * * * shall refuse to submit to such medical or surgical treatment as is reasonably essential to promote his recovery, the court may in its discretion reduce or suspend his compensation.

■ Interpreting this provision, *Rhodes v. Cottle Construction Co.,* 68 N.M. 18, 357 P.2d 672 (1960) states:

An employee may not be denied compensation because of his failure or refusal to accept medical treatment unless it be shown that such refusal was arbitrary and unreasonable.

68 N.M. at 23, 357 P.2d 672 (citation omitted). Thus, the question of whether refusal to submit to medical treatment should result in a reduction or suspension of compensation turns on a determination of whether the refusal is reasonable.

■ The trial court found that "[p]laintiff's refusal to undergo ... medical treatment is unreasonable." Whether refusal of medical treatment is arbitrary and unreasonable is a question of fact. The issue on appeal therefore is whether the court's finding that Brooks' refusal was unreasonable is supported by substantial evidence. *Escobedo v. Agriculture Products Co.,* 86 N.M. 466, 525 P.2d 393 (Ct.App.1974). On appeal, the court will view the evidence, together with all inferences reasonably deducible therefrom, in the light most favorable to support the findings of the court.

*Gonzales v. Bates Lumber Co.*, 96 N.M. 422, 631 P.2d 328 (Ct.App.1981).

In order to determine whether a worker has acted reasonably in refusing medical or surgical treatment, a trial court necessarily balances risks against benefits. This involves weighing the probability that the treatment will reduce the worker's disability by a significant amount against the probable risks associated with the treatment. A. Larson, *The Law of Workmen's Compensation* § 13.22 (1982). We recognize that there may be instances where the risks may be so great that the trial court would be justified in refusing to compel medical or surgical treatment no matter what benefits might be obtained. As noted in *Fowler v. W.G. Construction Co.*, 51 N.M. 441, 188 P.2d 160 (1947), if the operation is of a major character and attended by serious risk, the rule is that an injured employee's refusal is not unreasonable. We discuss the risks and the benefits to determine whether the record will support a finding that Brooks' refusal was arbitrary and unreasonable.

### a. The Risks.

Although the parties introduced a number of depositions which antedate the myelogram, the primary evidence before the trial court consisted of Brooks' testimony, the deposition of Dr. Altman, and medical reports of Dr. Maldonado and Dr. Maier. Dr. Maldonado, in his medical reports which were admitted into evidence, recommended a diskectomy. The surgical procedure is described in 1 J. Schmidt, *Attorneys' Dictionary of Medicine* D–90 (1984) as "the surgical excision (cutting out) of all or part of an intervertebral disk (a disk of cartilage between two adjacent vertebrae)." Dr. Maldonado did not describe the risks; however, Dr. Altman does. He also explains the difference between a diskectomy and chemonucleolysis, an alternative procedure which he preferred.

According to Dr. Altman, chemonucleolysis involves injecting dye into the disc space for proper positioning. If the disc appears abnormal, then chymopapain, a purified substance, is injected and this substance "dissolves away the disc." The primary difference between this procedure and diskectomy is that while both are intended to achieve the same result, i.e., disc removal, chemonucleolysis involves a non-surgical removal whereas diskectomy requires surgery. Should the chemonucleolysis fail, then the physician must be prepared to immediately perform a diskectomy.

Dr. Altman said that 1% of the people undergoing chemonucleolysis will have an anaphylactic reaction and go into shock, and that 10% of those who suffer anaphylaxis will die. In describing the results of chemonucleolysis or a diskectomy, Dr. Altman said one runs "a 20 percent failure rate where you might have a complication or just not improved, particularly with say, you do a surgical procedure, you remove the disc, you leave a lot of scar tissue down there behind the nerve roots, and damaged the ligament and the gliding mechanism, and sometimes they develop a poor result from this."

With chemonucleolysis the patient has "a lot of aching in the back, back spasms" for about three months. In addition, "The first four or five days [following the procedure] can sometimes be quite painful as the joint collapses. * * * "

### b. The benefits.

Dr. Altman testified that with a successful surgery, referring to chemonucleolysis or diskectomy, Brooks' pain at the L4–5 level could significantly decrease. He also said that with the chemonucleolysis she had an 80% chance of improving her "physical situation." Dr. Altman added, "those are very good odds." With regard to Brooks' fear of paralysis, Dr. Altman said the risk was "[v]ery, very, very tiny." Of that 80% success rate, Dr. Altman stated that 17–20% of the patients are "as good as new." The remaining 60% will be "improved, they'll have less pain, they'll be better, more mobile, more active, considerably more comfortable, and require much less medication." At her age, Brooks

would likely fall into the latter category, according to Dr. Altman.

Dr. Maldonado estimated a 50–75% chance of improvement. He estimated a temporary total disability for four to six months following surgery, indicating that with good results "the disability from this type surgery is in the range from 10–15% of the body."

### c. Weighing the risks and benefits.

■ We conclude that, even if the risks are minimal, the evidence will not support a finding of any benefit which would reduce Brooks' disability as defined in the Workmen's Compensation Act. Disability must be defined and established in terms of being able to perform the usual tasks of the work Brooks was doing when injured, or any other work for which she was fitted by age, education, training, physical and mental capacity, and experience. NMSA 1978, §§ 52–1–24, 52–1–25; *Goolsby v. Pucci Distributing Co.*, 80 N.M. 59, 451 P.2d 308 (Ct.App.1969).

■ Nowhere does Dr. Maldonado tie his estimate of 10–15% of the body to disability as defined in the Act. *See* NMSA 1978, § 52–1–25. The trial court undoubtedly adopted this percentage when it found, "The above mentioned medical treatment would reduce plaintiff's disability to fifteen percent or less." The medical treatment in the findings refers to "chemonucleolysis or, if that should fail, disc surgery." Since 25–50% of patients do not achieve any success, according to Dr. Maldonado, the record does not support an absolute finding that Brooks disability would be reduced to 15% or less following treatment. Moreover, a determination of medical disability alone does not resolve the question of disability under the worker's compensation law. *See Goolsby.*

Absent any evidence tieing the trial court's finding that the medical treatment would reduce Brooks' disability to 15% or less to Brooks' ability to work following treatment, the finding must fall. It appears that Dr. Maldonado's opinion supporting the trial court's finding relates to medical impairment.

Dr. Altman does address disability in the sense used in worker's compensation law. Given a work history as an assistant cook, the work Brooks was doing when injured, and prior work as a maid, and assuming a good result from the medical treatment, he doubted to a reasonable degree of medical probability that there was any treatment that could return Brooks to these former occupations.

Following successful treatment, Dr. Altman would restrict Brooks to no more than twenty-five to thirty-five pounds of limited lifting. He would advise against repetitive bending or bending and lifting.

■ This physician testified that with a successful result, he felt Brooks might be able to work on a limited basis, four to six hours a day, as a chef, "just directing the mixing of things and making salads or sandwiches or something like that, on a part-time basis." This would take extensive training, according to Dr. Altman. Defendants did not prove that Brooks could even qualify for that type of work. *See Brown v. Safeway Stores, Inc.*, 82 N.M. 424, 483 P.2d 305 (Ct.App.1970). There may be other areas of employment for which Brooks would be qualified by reason of age, education, training, general physical and mental capacity and previous work experience; however, the record does not indicate what they might be. Before a worker may be compelled to undergo serious medical or surgical treatment at the risk of suspension or reduction of his or her compensation, the defendants must show the employability of the worker for a particular job or jobs following the successful treatment.

To Brooks the answer to the risk-benefit analysis is simple. She said, "If I died it wouldn't do me no good no way, you know; I would never be able to work anymore." When reminded that successful surgery would ease her pain, she responded, "But I wouldn't be able to work anymore."

■ Even if the risk of paralysis or death is minimal, still the benefit to be gained must be significant. Here, the proof would perhaps support improvement from the standpoint of physical impairment but not improvement in the sense that Brooks could engage in gainful employment.

As we stated in *Escobedo,* "The decisions indicate that it is not unreasonable to refuse 'disc surgery' or a 'laminectomy' because of the 'major' nature of those operations." 86 N.M. at 471, 525 P.2d 393 (citations omitted). *See also* A. Larson, § 13.-22, at 3–410. In *Escobedo* this court upheld a finding requiring the worker to undergo a myelogram, but reversed as premature the trial court's decision to reduce compensation if he refused the treatment indicated by the myelogram. Here Brooks underwent the myelogram but refused the treatment. When asked to compare the risks and the pain of chemonucleolysis with a myelogram, Dr. Altman said:

Well, this chemonucleolysis is much more dangerous than a myelogram. The danger of a myelogram is the patient getting an arachnoiditis and having a matting down of the nerve roots. And this is a very definite complication where the patient could actually get worse. It's rare, but it can happen.

Chemonucleolysis is done under general anesthesia, so the procedure, itself, is not painful. The first four or five days can sometimes be quite painful as the joint collapses, but then they are in the hospital and they are under medication. The chemonucleolysis, as I mentioned, has a danger to it. The only danger of a myelogram is arachnoiditis, or a post spinal headache.

In *Aranda v. D.A. & S. Oil Well Servicing, Inc.,* 98 N.M. 217, 647 P.2d 419 (Ct. App.1982), we declined to require the worker to undergo a second myelogram. Here, under the proof offered, we decline to require Brooks to undergo the treatment indicated by the myelogram she did undergo.

**CONCLUSION**

■ In summary, we hold that an employer and its carrier may seek a reduction or suspension of compensation being paid to a worker for refusal to submit to medical or surgical treatment under Section 52–1–51. The determination of whether the worker's refusal is arbitrary and unreasonable requires weighing the benefits likely to result from the recommended surgery or treatment against the risks involved. The benefits must be tied to a reduction of disability as that term is used in the Workmen's Compensation Act; not just to a reduction in medical impairment. Finally, we recognize that there may be cases where the treatment or surgery is of such a major character and attended with such serious risks that refusal may be justified notwithstanding the benefits to be derived.

■ Under the facts presented in this case, because there was no showing that with a successful result Brooks' disability would have been reduced, her refusal to submit to the recommended treatment was not unreasonable and the judgment must be reversed.

We reverse the judgment reducing Brooks' compensation and remand for a determination of her attorney fees in light of this opinion. Brooks is awarded her costs on appeal and $2,000 attorney fees.

**IT IS SO ORDERED.**

ALARID and MINZNER, JJ., concur.