2002-NMCA-025

41 P.3d 923

**Mack HENINGTON, Worker–Appellee,**

v.

**TECHNICAL–VOCATIONAL INSTITUTE and New Mexico Public School Insurance Authority, Employer/Insurer–Appellants.**

No. 21,758.

Court of Appeals of New Mexico.

Jan. 10, 2002.

Certiorari Denied, No. 27,336, Feb. 26, 2002.

Gerald A. Hanrahan, Albuquerque, NM, for Appellee.

Phyllis S. Lynn, Yenson, Lynn, Allen & Wosick, P.C., Albuquerque, NM, for Appellants.

## OPINION

WECHSLER, Judge.

{1} This case requires us to address the application of the statute of limitations in the context of a worker's claim for increased scheduled injury benefits based on the increased loss of use of his left knee. We hold that agreements to pay medical and compensation benefits are "compensation order[s]" within the meaning of NMSA 1978, § 52–1–56 (1989), even if they have not been reduced to writing and approved by the workers' compensation judge (WCJ). We further hold that the statute of limitations of NMSA 1978, § 52–1–31(A) (1987) applies to initial claims for benefits, not to later claims for increased benefits based on a change in a worker's physical condition. We further agree with the WCJ that NMSA 1978, § 52–1–43(B) (1989) does not limit the amount of time in which a worker may file a claim for increased benefits under Section 52–1–56. Thus, we affirm the order awarding Worker additional benefits.

*Arguments on Appeal*

{2} Respondents, Technical–Vocational Institute (T–VI) and the New Mexico Public School Insurance Authority, appeal from the decision of the WCJ awarding Mack Henington (Worker) increased benefits based on the increased partial loss of use of his left knee. On appeal, Respondents argue (1) that Worker's claim for increased benefits cannot be brought under Section 52–1–56 because there is no compensation order in this case; (2) that Worker's claim is barred by Section 52–1–31(A) because Worker knew or should have known of the increased impairment rating or loss of use of the knee more than two years and thirty-one days before the claim for increased benefits was filed; and (3) even if the claim is not barred by Section 52–1–31(A), it is barred because it was not filed during the time that Worker was receiving benefits under Section 52–1–43. Respondents also make arguments based on NMSA 1978, § 52–5–9 (1989), which they did not raise below and, therefore, we do not consider on appeal. *See Gracia v. Bittner*, 120 N.M. 191, 196–97, 900 P.2d 351, 356–57 (Ct. App.1995) (explaining that to preserve an issue about the application of a particular statute to a particular situation, appellant must have raised the issue in the trial court and invoked a ruling on the issue); *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496–97, 745 P.2d 717, 721–22 (Ct.App.1987) (stating that to preserve an appellate issue, appellant must invoke ruling of trial court "on the same grounds argued in the appellate court").

*Facts*

{3} The facts in this case are not in dispute. Worker was employed by T–VI as Dean of Student Affairs. On October 22, 1992, he was injured when a drunken driver broadsided the T–VI car Worker was driving on T–VI business. During the collision, Worker's left knee hit the steering column of the T–VI car. He also injured his right knee, although less severely. He returned to work about ten days after the accident.

Worker did not lose any wages while he was off work following the accident because the time was covered by sick leave.

{4} After returning to work, Worker continued to have problems with both knees. On February 12, 1993, Dr. Anthony Pachelli performed bilateral arthroscopic surgery to repair meniscal tears in both knees. Worker again used his vacation and sick leave for the time that he was unable to work and therefore did not lose any wages. Worker reached maximum medical improvement (MMI) from the initial injuries and surgery on June 28, 1993, at which point Dr. Pachelli assessed his impairment rating as 15% to each lower extremity.

{5} Although he had reached MMI in June 1993, Worker's left knee continued to hurt. In August 1993, Worker saw Dr. William Chesnut. Dr. Chesnut told Worker that if his symptoms continued to increase, he would need a total knee replacement (TKR) at some point in the future. Dr. Chesnut indicated that this procedure "should only be considered when [Worker] gets to the point that he is having pain daily that interfers [sic] with his quality of life and begins to have pain at night that awakens him or keeps him awake." Worker asked Dr. Chesnut if this opinion meant his impairment rating should be increased. However, Dr. Chesnut concurred in the 15% impairment rating to the left knee that had been assigned by Dr. Pachelli.

{6} Sometime in late 1993 or early 1994, Worker made a claim for scheduled injury benefits from the date of MMI forward. Ultimately, Respondents agreed to pay Worker scheduled injury benefits based on the 15% impairment rating for each knee for the period from June 28, 1993 through May 31, 1996. We note that the agreement to pay benefits was reached before this Court decided *Lucero v. Smith's Food & Drug Centers, Inc.*, 118 N.M. 35, 37–38, 878 P.2d 353, 355–56 (Ct. App.1994) (holding that a worker need not prove an impairment as defined by statute in order to receive scheduled injury benefits). We further note that both sides have continued to equate the impairment rating to the loss of use. Thus, we refer to the impairment rating and the loss of use interchangeably.

{7} Worker's left knee continued to hurt off and on. Worker's knee locked up on him in January 1995. In May 1996, when he received his last payment of scheduled injury benefits, Worker was having significant pain in his left knee every few weeks.

{8} On July 13, 1998, Dr. Pachelli performed a TKR on Worker's left knee. Once again, Worker used his accumulated sick and annual leave to cover the time that he was off work. Worker reached MMI from this surgery on October 11, 1999. Unfortunately, the TKR did not eliminate the problems with Worker's left knee, which continued to be swollen with fluid and unable to be bent more than 85 degrees, sometimes less. The knee also continued to be painful and give out at times. Worker still could not play tennis, dance, or walk downhill. Even the vibration from a car could aggravate the pain. On October 11, 1999, Dr. Pachelli increased the impairment rating for the left knee from 15% to 50%.

{9} On December 22, 1999, Worker filed a complaint with the Workers' Compensation Administration. After some initial exchange of documents, the claim was reduced to one for increased scheduled injury benefits based on the increased impairment or loss of use of his left knee. Respondents contended that the claim was barred by Section 52–1–31(A). The WCJ determined the claim was not time barred, and Respondents appealed to this Court.

*Applicability of Section 52–1–56*

{10} Under Section 52–1–56, the WCJ may increase or decrease compensation benefits based upon changes in the worker's disability. Section 52–1–56 provides in pertinent part that "[t]he workers' compensation judge may, upon the application of the employer, worker or other person bound by the compensation order, fix a time and place for hearing."

{11} Respondents contend that Section 52–1–56 requires the existence of a compensation order. Thus, they argue that, because there was no compensation order below, Section 52–1–56 did not apply to Worker's claim for increased benefits. According to Respondents, Section 52–1–56 excludes cases such as

this one, in which an employer pays benefits by agreement without a formal claim being filed. Worker does not disagree with Respondents' argument but contends that the principles of Section 52–1–56 and cases decided under it should apply to his claim. The WCJ essentially held that Section 52–1–56 applies to Worker's claim for increased benefits. We agree.

{12} The meaning of language used in a statute is a question of law that an appellate court reviews de novo. *State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995). In construing a statute, our goal is to give primary effect to the intent of the legislature. *Draper v. Mountain States Mut. Cas. Co.,* 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994). We ascertain the intent of the legislature primarily from the language used in the statute. *See id.* We give such language its ordinary and plain meaning unless the legislature indicates a different interpretation is necessary. *Id.* However, we also recognize that the "beguiling simplicity [of the plain meaning rule] may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., non-frivolous) differences of opinion concerning the statute's meaning." *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994); *see also Draper,* 116 N.M. at 777, 867 P.2d at 1159 (explaining that the intention of the legislature will prevail over the strict meaning of the literal language).

{13} We believe that this case is the type in which the plain language of the section would frustrate rather than advance the legislature's intent. The purpose of Section 52–1–56, as demonstrated by its language and by our opinions concerning its predecessor statutes, is to give a WCJ the power to increase or decrease awards of compensation upon a proper showing. *See Gallegos v. City of Albuquerque,* 115 N.M. 461, 463, 853 P.2d 163, 165 (Ct.App.1993) (explaining that employer seeking reduction in awarded benefits needs to show a decrease in worker's disability whereas worker seeking increase in benefits has burden to show increase in disability); *St. Clair v. County of Grant,* 110 N.M. 543, 547–48, 797 P.2d 993, 997–98 (Ct.App. 1990) (stating that district court possesses continuing jurisdiction to reopen workers'

compensation award under Section 52–1–56); *Glover v. Sherman Power Tongs,* 94 N.M. 587, 589–90, 613 P.2d 729, 731–32 (Ct.App. 1980) (holding that any compensation judgment may be reopened during remainder of statutory period as Workers' Compensation Act (Act) was not written to bind worker to "one-shot" chance to determine disability). This purpose is equally served when the initial benefits have been paid by agreement.

{14} In this case, Respondents agreed from the outset that the accidental injury was sustained in the course and scope of employment, that they had proper notice, and that the disability was causally connected to the accidental injury. Thus, in effect, they agreed they were liable to pay benefits. Respondents later agreed to the payment of benefits of a specific amount, for a specific period of time, based on a specific impairment rating. Respondents fully paid these benefits.

{15} Worker never proceeded to a litigated conclusion of a formal claim for benefits because the matter appeared to have been resolved prior to entry of a compensation order. Indeed, except in circumstances that do not apply here, the Act prohibits a worker from filing a claim for benefits if he or she is receiving the maximum allowable benefits. NMSA 1978, § 52–5–18 (1989). There is no question that the policy of the Act is to encourage employers and insurers to pay claims without requiring a worker to file a claim. *See* NMSA 1978, § 52–1–54(E), (J) (1993) (requiring employers to pay part of worker's attorney fees if worker is forced to file a claim in order to obtain compensation); *Wilson v. Richardson Ford Sales, Inc.,* 97 N.M. 226, 228, 638 P.2d 1071, 1073 (1981) (citing the policy as support for holding that the voluntary payment of benefits by an employer does not constitute an admission of liability, although it is a factor to be considered in determining whether employer has admitted liability for benefits); *Gallegos,* 115 N.M. at 463–64, 853 P.2d at 165–66 (citing the policy in holding that worker has the burden of proving entitlement to benefits even when employer files a petition to decrease benefits based on an alleged decrease in disability). This policy of judicial economy

would be significantly undercut if we were to hold that benefits paid by agreement cannot be increased or decreased as appropriate when the disability changes, merely because there is no formal order awarding compensation.

{16} Our interpretation of Section 52–1–56 is supported by our interpretation of similar language used in Section 52–5–9(B), the statute discussing grounds for modifications of compensation orders. Section 52–5–9, like Section 52–1–56, refers specifically to modification of a "compensation order." Regardless, we have interpreted the term "compensation order" to apply to the initial award of benefits even though the award was not, in the strict sense of the term, a compensation order. *See Fasso v. Sierra Healthcare Ctr.,* 119 N.M. 132, 134, 888 P.2d 1014, 1016 (Ct. App.1994) (finding that recommended resolution following settlement conference became binding compensation order because neither party objected); *Curliss v. B & C Auto Parts,* 116 N.M. 668, 670, 866 P.2d 396, 398 (Ct.App.1993) (treating lump sum settlement agreement as "compensation order" for purposes of modification and review under Section 52–5–9).

{17} *Brooks v. Hobbs Municipal Schools,* 101 N.M. 707, 709–10, 688 P.2d 25, 27–28 (Ct.App.1984), does not hold differently. In that case, the employer began paying benefits when the worker was injured. Later, the employer wanted to terminate benefits because the worker had refused surgery and other treatment that was recommended by her physicians. *Id.* This Court held that the provision of the Act authorizing the reduction of benefits in such a situation implicitly gave the district court jurisdiction to determine the employer's claim. *Id.* In dictum, we stated that Section 52–1–56 did not apply because there was no judgment. *Brooks,* 101 N.M. at 709–10, 688 P.2d at 27–28. However, in *Brooks,* the absence of a judgment was not a technicality. Although there had been a stipulation, the parties had yet to agree that the employer was liable to pay disability benefits based on a particular disability caused by the accidental injury. *Id.* at 709, 688 P.2d at 27. By contrast, in this case, employer agreed that it was liable to pay scheduled injury benefits, for a specific period of time, based on a specific percent-

age impairment or loss of use. The question is whether this agreement is subject to modification based on a change in Worker's physical condition. When the parties have agreed to the payment of benefits at a specific amount, for a specific time, based on a specific disability and a specific percentage loss of use or impairment rating, that agreement satisfies the requirement of a compensation order for the purposes of Section 52–1–56 such that it can be modified based on a change in the worker's physical condition.

*Inapplicability of Section 52–1–31(A)*

{18} Respondents argue that Worker's claim is barred by the limitation period of Section 52–1–31(A). They note that because the injury and disability occurred before the 1993 amendments to the Act were effective, the relevant limitations period for this case is two years and thirty-one days. *See* NMSA 1978, §§ 52–1–30, 52–1–31 (1987). We assume without deciding that they are correct. The claim for increased benefits was filed on December 22, 1999. Thus, Respondents contend that the claim is barred if Worker knew or should have known that he had a compensable injury at any time before October 23, 1997. Respondents further claim that Worker in fact knew or should have known that he was entitled to increased benefits as early as August 1993, when his doctor advised him that he would ultimately need a TKR. Respondents point out that Worker continued to have pain in his left knee even after the first surgery, that this pain increased over time, and that Worker's knee locked up in January 1995. Respondents argue that the WCJ's findings on this issue are not supported by substantial evidence when viewed in the light of the record as a whole. Additionally, Respondents argue this issue as a matter of law.

{19} We ultimately rule that Section 52–1–31 does not apply. However, even if it did apply, Respondents' argument is without merit. The WCJ found as fact that from June 28, 1993, to July 29, 1998, Worker had received all the benefits to which he was entitled and that Worker did not suffer an increased disability to his left knee until October 11, 1999. On appeal, we review the

whole record to determine whether there is substantial evidence to support the WCJ's findings. *Chavarria v. Basin Moving & Storage*, 1999–NMCA–032, ¶ 11, 127 N.M. 67, 976 P.2d 1019. In making this determination, we view the evidence in the light most favorable to the finding below. *Herman v. Miners' Hosp.*, 111 N.M. 550, 552, 807 P.2d 734, 736 (1991). The question is whether, viewed in the light of the whole record, the finding is reasonable. *Id.* The fact that the evidence might have supported different findings does not require us to reverse. *Id.*

{20} Respondents point to the following evidence that, they contend, shows that the WCJ's finding was not reasonable. Worker was told in 1993 that he would eventually need a total knee replacement. Worker's left knee was more painful than his right knee, although he had been given the same impairment rating for each knee. The pain in his left knee sometimes limited Worker's ability to ride a bicycle, play tennis, and jog. In January 1995, Worker's left knee locked up on him while he was riding a bicycle. By May 1996, Worker was having significant pain in his knee every few weeks. Based on this evidence, Respondents contend that Worker knew or should have known as early as July 1994 or January 1995 that he had a claim for increased benefits. They rely on *ABF Freight System v. Montano*, 99 N.M. 259, 260, 657 P.2d 115, 116 (1982), and *Noland v. Young Drilling Co.*, 79 N.M. 444, 447, 444 P.2d 771, 774 (Ct.App.1968).

{21} We are not persuaded by the argument. *ABF Freight System* and *Noland* were both decided at the time that disability was defined as an inability to perform work. *See Torres v. Plastech Corp.*, 1997–NMSC–053, ¶ 21, 124 N.M. 197, 947 P.2d 154. However, since 1991, determinations of disability have been based on the worker's impairment, as defined by the current edition of the American Medical Association Guide to the Evaluation of Permanent Impairment. NMSA 1978, § 52–1–24(A), 52–1–26(B) (1990).

{22} Through the testimony of his treating physician, Worker established his initial impairment rating of 15% in 1993 and his impairment rating of 50% in October 1999. Respondents claim that Worker's impairment rating increased some time before the Octo-

ber 1999 impairment rating of 50%, but have not pointed to expert medical testimony that would establish that Worker's impairment rating was more than 15% at any time between 1993 and 1999, much less that Worker should have known of the increase in impairment rating.

{23} We recognize that, as a factual matter, a worker may know that he has an injury for which he is entitled to compensation without knowing the impairment rating. *See Montoya v. Kirk–Mayer, Inc.*, 120 N.M. 550, 551–55, 903 P.2d 861, 862–66 (Ct.App. 1995). However, in this case, the increase in impairment rating is the critical fact. Respondents are contending that Worker's impairment rating increased to more than 15% at some point before October 1999. In the absence of evidence showing that Worker was experiencing symptoms that would result in an impairment rating of more than 15% at some point prior to October 1999 and that Worker should have known that his symptoms resulted in an increased impairment rating, the WCJ reasonably determined that Worker's impairment rating did not increase until October 1999, when his treating physician determined that Worker had a 50% impairment to his left knee. *See Smith v. Dowell Corp.*, 102 N.M. 102, 104, 692 P.2d 27, 29 (1984) (stating that it would be "patently unfair to expect the common laborer to have greater knowledge than the medical expert").

{24} Although we reject Respondents' substantial evidence argument, we note that it is premised on Respondents' contention that Section 52–1–31(A) applies to Worker's claim for increased benefits. However, it is well settled that Section 52–1–31(A) applies only to initial claims for compensation, not to applications for modification of benefits under Section 52–1–56. *Norvell v. Barnsdall Oil Co.*, 41 N.M. 421, 423, 70 P.2d 150, 152 (1937) (stating that application for increase or decrease may be presented at any time within the period for which compensation is allowable); *Martinez v. Earth Res. Co.*, 90 N.M. 590, 592, 566 P.2d 838, 840 (Ct.App.1977) (relying on *Norvell* ), *overruled on other grounds by Garza v. W.A. Jourdan, Inc.*, 91 N.M. 268, 270, 572 P.2d 1276, 1278 (Ct.App. 1977). Therefore, technically, we need not

have addressed Respondents' arguments concerning when the limitations period provided by Section 52–1–31(A) began to run on the claim for increased benefits.

*Lack of Preservation as to Section 52–5–9*

■ {25} Respondents also argue that Worker's claim for increased scheduled injury benefits is not timely under Section 52–5–9 because it was made more than two years after the last payment to Worker. On the other hand, Worker contends his claim is timely under the other provision of Section 52–5–9, making a claim timely if made within two years after denial of benefits. However, Respondents did not argue to the WCJ that Section 52–5–9 applied to this case. Accordingly, Respondents cannot raise the issue for the first time on appeal.

*Inapplicability of Section 52–1–43*

■ {26} Respondents argue that if Section 52–1–56 applies to this case, Worker is still not entitled to an increase in payments. In support of this contention, Respondents point to earlier cases involving this section, which, they contend, have held that Section 52–1–56 only allows a claimant to seek an increase in benefits until the maximum statutory period for receiving benefits has expired. Worker's injury to his left knee is a scheduled injury for which he is entitled to 150 weeks of benefits. Section 52–1–43(A)(30). It is undisputed that the 150 weeks ended on May 31, 1996. Thus, Respondents contend, Worker cannot now seek increased benefits under Section 52–1–56 based on the increased impairment or loss of use after the conclusion of the benefit period.

{27} We do not agree that prior case law supports Respondents' position. Respondents rely initially on *Churchill v. City of Albuquerque*, 66 N.M. 325, 327, 347 P.2d 752, 753 (1959), and *Segura v. Jack Adams General Contractor*, 64 N.M. 413, 416, 329 P.2d 432, 433–34 (1958). The issue in those cases was whether a modification of the original judgment was prohibited by the doctrine of res judicata. In *Churchill*, our Supreme Court held that the original judgment was not final in the res judicata sense. *Churchill*, 66 N.M. at 327, 347 P.2d at 753. The judgment in *Churchill* was for a limited period of time. Nevertheless, the Court held that the

judgment could be modified at any time until the 550 weeks during which worker could have received benefits had run. *Id.* In so holding, the Court quoted with approval from its previous opinion in *Segura*, 64 N.M. at 416, 329 P.2d at 433–34, as follows:

> In view of provisions of the applicable statute [the predecessor to Section 52–1–56] the ordinary rules of res judicata cannot apply to a judgment rendered on the merits after trial. In fact, in such a case *except for loss of a specific member of the body* there is no final judgment as it is generally understood short of 550 weeks when either party may come into court and have a hearing on a decrease or increase of disability and have a new judgment rendered in accordance with new findings. (Emphasis added.)

Like *Churchill*, *Segura* involved a judgment for a limited period of time that was less than the full period for which the worker could have received benefits.

{28} Respondents contend that the underlined language from *Segura* amounts to a holding that Section 52–1–56 does not apply to scheduled injuries as a matter of law. However, we believe that this interpretation does not consider the specific reference to "loss" of a body member. At the time *Segura* was written, the "loss" of a scheduled member meant its amputation or suffering an injury that rendered the scheduled member useless. *Gonzales v. Pecos Valley Packing Co.*, 48 N.M. 185, 189, 146 P.2d 1017, 1019 (1944). We believe that the Supreme Court's language in *Churchill* is simply a recognition that, as a practical matter, the loss of a limb was not a condition that would change over time.

{29} Each party argues that *Glover*, 94 N.M. at 589, 613 P.2d at 731, supports its position. Worker has the better of the argument. In *Glover*, the original judgment awarded the worker benefits based on a 25% disability to his dextrous hand. The award was paid in full even before the judgment was entered. *Id.* at 588, 613 P.2d at 730. A year later, the worker applied for an increase in benefits, arguing that he had become totally disabled. *Id.* The trial court determined that the worker was totally and permanently

disabled as that phrase was defined by the statute in effect at the time and ordered that the defendants pay total disability benefits. *Id.* at 589, 613 P.2d at 731. On appeal, this Court held that the worker could file a claim for increased benefits under Section 52–1–56 even though the scheduled injury award had been fully paid before the first judgment was entered. *Id.* In so holding, this Court overruled its prior opinion in *Sena v. Gardner Bridge Co.,* 93 N.M. 358, 600 P.2d 304 (Ct. App.1979), and adopted the views expressed in the dissent filed in that case. *Glover,* 94 N.M. at 589, 613 P.2d at 731. In addition, this Court specifically rejected the argument that the result should be different because the initial award was for scheduled injury benefits. *Id.* at 590, 613 P.2d at 732. This Court stated:

> The Workman's Compensation Act was not written with the intent that it be so penuriously interpreted that a workman be bound by a "one-shot" chance at showing his ability or inability to perform the tasks of his usual occupation or other work he is fitted by past history to do.... Section 52–1–56(A) was unquestionably intended to meet the effect of changes which could occur in a workman's physical condition, as related to a compensable injury (whether the change be for better or worse), *during the period for which compensation could be paid.*

*Id.* Other decisions of this Court decided under prior versions of the Act have also allowed petitions for modification to be filed at any time during the maximum period for which benefits could have been paid. *See, e.g., DiMatteo v. County of Doña Ana,* 109 N.M. 374, 377, 785 P.2d 285, 288 (Ct.App. 1989) (arguably dicta); *Rumpf v. Rainbo Baking Co.,* 96 N.M. 1, 3–4, 626 P.2d 1303, 1305–06 (Ct.App.1981) (reversing dismissal of claim with prejudice because worker was entitled to file a claim under Section 52–1–56 (prior version) if his condition deteriorated in the future); *Burton v. Jennings Bros.,* 88 N.M. 95, 97, 537 P.2d 703, 705 (Ct.App.1975) (holding that the fact that the judgment previously entered had been fully paid out did not foreclose worker from filing a petition for modification based on Section 52–1–56 (prior version)).

{30} Respondents contend that because Worker's application for increased benefits related to the same scheduled injury for which he originally received benefits, it is not timely because it was not filed within the 150 weeks during which Worker initially received compensation for his scheduled injury. However, we agree with the WCJ that the time period for benefits in Section 52–1–43(A) serves as a calculator of the total benefits to be paid and provides for an accelerated payout schedule. We do not agree that the time for which compensation is allowable is the amount of time specified for the payment of benefits for a particular injury in Section 52–1–43(A). On the contrary, Section 52–1–43(C) gives the WCJ discretion to enlarge or even double the time period of Section 52–1–43(A) if the Worker's disability results from actual amputation of an arm or leg. Similarly, Section 52–1–43(D) provides that Worker shall receive benefits as provided in Section 52–1–43(A) from the date of disability to the date he is "released from regular treatment by his primary treating health care provider" if he is totally disabled during that time. This compensation is in addition to the compensation provided for in Section 52–1–43(A). Section 52–1–43(D) further provides that "in no event shall any worker be entitled to compensation for a period in excess of seven hundred weeks." In short, the time for which compensation is allowable is set by statute at 700 weeks. The 150 weeks of benefits available under Section 52–1–43(A) is the minimum amount of time that a worker may receive benefits under this section.

{31} We believe that this interpretation of the statute is the one adopted by this Court in *Glover.* In *Glover,* the employer argued that the worker's disability ended when he had received all the payments to which he was entitled for the scheduled injury. This Court held, however, that "any judgment for compensation in a workman's compensation case may be reopened during the remainder of the statutory period after the original judgment, for the purpose of requesting an increase or decrease in compensation benefits." *Glover,* 94 N.M. at 589, 613 P.2d at 731; *see also id.* at 590, 613 P.2d at 732 ("Section 52–1–56(A) was unquestionably intended to meet the effect of changes which

could occur in a workman's physical condition ... *during the period for which compensation could be paid.*"). At the time *Glover* was decided, the maximum period of time that a worker could receive benefits for total disability, partial disability, or a scheduled injury was set by statute as 600 weeks. *See* Laws 1975, ch. 284, §§ 8, 9, 10, 11, 12 (changing the maximum period for which compensation is payable in those and other sections of the Act to 600 weeks); *see also Witcher v. Capitan Drilling Co.,* 84 N.M. 369, 372, 503 P.2d 652, 655 (Ct.App.1972) (stating that sections of the Act relating to scheduled injuries, permanent partial disability, and permanent total disability are to be read together to produce a harmonious whole).

{32} When considering sections of the Workers' Compensation Act, we consider the language of the particular section in the context of the entire Act. *Draper v. Mountain States Mut. Cas. Co.,* 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994). By enacting Section 52–1–56, the legislature provided that compensation payments would be increased if the disability "has increased without the fault of the worker." Section 52–1–56. Nothing in Section 52–1–56 suggests that it only applies to partial disability payments.

{33} Thus, we agree with the WCJ that the scheduled injury section does not limit the time in which a worker can file a petition to modify benefits under Section 52–1–56. The scheduled injury section, Section 52–1–43, is no more or less than a limitation of the amount and payout of benefits for certain injuries covered by that section. However, as this case illustrates, the extent of disability brought about by a particular injury often changes over a period of years. The legislature designed Section 52–1–56 and its predecessors to provide a way to adjust compensation awards based on changes in a worker's physical condition. *Herrera v. Quality Imports,* 1999–NMCA–140, ¶¶ 7–9, 128 N.M. 300, 992 P.2d 313. The Supreme Court and this Court have held that claims under Section 52–1–56 can be filed at any time during the maximum period that a worker could have received benefits, even if the original judgment awarded benefits for less than that period of time and even if the

original judgment had been fully paid some time earlier. When a law has been consistently interpreted in a particular way, we will assume that the use of the same language in a later version of that law indicates that the legislature intended that interpretation to apply to the newer version of the law as well. *Twin Mountain Rock v. Ramirez,* 117 N.M. 367, 370, 871 P.2d 1373, 1376 (Ct.App.1994).

*Conclusion*

{34} We hold that Worker's claim for increased scheduled injury benefits was cognizable under Section 52–1–56. We also hold that Section 52–1–31(A), which defines the limitations period that applies to original proceedings for benefits, does not apply to claims for increased benefits under Section 52–1–56. We further hold that claims for increased benefits based on a change in the worker's physical condition may be filed at any time during the period in which Worker could have received benefits, even though the benefits actually received were for a lesser period of time because the disability was a scheduled injury and even though those benefits have been fully paid. Therefore, we affirm.

{35} On remand, the WCJ shall determine the amount of attorney fees that should be awarded for the services of Worker's attorney incurred in connection with this appeal.

{36} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, Judge, and LYNN PICKARD, Judge.