**Certiorari Denied, April 7, 2016, No. S-1-SC-35805**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2016-NMCA-041**

**Filing Date: February 15, 2016**

**Docket No. 34,185**

**ERIC TRUJILLO,**

       **Worker-Appellant,**

**v.**

**LOS ALAMOS NATIONAL LABORATORY,**

       **Employer/Self-Insured-Appellee.**

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Leonard J. Padilla, Workers' Compensation Judge**

Annie-Laurie Coogan LLC
Annie-Laurie Coogan
Santa Fe, NM

for Appellant

Camp Law, LLC
Minerva Camp
Albuquerque, NM

for Appellee

**OPINION**

**WECHSLER, Judge.**

**{1}** Worker Eric Trujillo seeks review of a Workers' Compensation Administration ruling that denied reinstatement of temporary total disability (TTD) and medical benefits. The Workers' Compensation Judge (WCJ) dismissed Worker's claims after ruling that Worker failed to prove causation to a reasonable degree of medical probability. Because substantial evidence does not support the WCJ's ruling, we reverse.

1

**BACKGROUND**

**{2}**     Worker was employed by Los Alamos National Laboratory (LANL) (Employer)[1] as a laborer and labor foreman beginning in July 1994. Worker's duties included trenching, snow removal, tree cutting, moving furniture, construction, and demolition work. Over the years, Worker suffered various work and non-work related injuries. Several of these injuries affected Worker's back and neck. Worker did not miss significant time at work due to any of these injuries, although he did file a workers' compensation claim for an ergonomic injury in 2006 that was denied.

**{3}**     On November 30, 2012, Worker was participating in the installation of electrical equipment when he fell approximately six feet to the ground from a scaffolding. Worker testified that he was carrying a chipping hammer down from the scaffolding platform, stepped on an oily or slick spot on the scaffolding, and landed flat on his back. Worker also testified that the chipping hammer weighed approximately twenty-five pounds and that his hard hat cracked when he hit the ground. Worker's testimony as to the circumstances of the accident are not in dispute.

**{4}**     Several hours later, Worker arrived at Occupational Medicine (Occ Med), which is Employer's in-house medical facility. Occ Med is the initial medical provider for on-the-job injuries and also provides interim care for on-the-job injuries and clearance for employees to return to work from injuries or extended absences. Worker was diagnosed with (1) multiple contusions to the back, neck, and upper-extremities; (2) tenderness in the mid-back and C-spine; and (3) tingling in both elbows. Worker's examination was described as "unremarkable," and he was given anti-inflammatory medication and allowed to return to work without restrictions.

**{5}**     Worker finished his shift without further incident. After returning home, Worker became very stiff and was making nonsensical statements, at which point his wife drove him to Los Alamos Medical Center. Worker was diagnosed with similar conditions noted at Occ Med, as well as a head injury.

**{6}**     Worker returned to Occ Med for follow-up care on December 3, 2012, and he was seen by Dr. Sara Pasqualoni. Dr. Pasqualoni diagnosed Worker with (1) a concussion; (2) cervical, thoracic, and lumbar strains; (3) chronic pain syndrome; and (4) elevated blood pressure. At the conclusion of the appointment, Worker stood to exit and fell directly onto his face. Worker was transported back to Los Alamos Medical Center and was re-admitted.

---

[1]Prior to a transition to in-house management of labor services at LANL in 2008, Worker was employed by Johnson Controls and KSL. Previous on-the-job injuries/accidents referred to in this opinion may have occurred during employment with these entities. Because there is no legal significance as to which entity employed Worker prior to 2008, we refer simply to Employer or LANL throughout.

During a follow-up to Worker's December 3, 2012 appointment, Dr. Pasqualoni also referred Worker to his primary care physician, Dr. Kidman, for continued management of Worker's chronic pain.

**{7}**     Worker returned to Occ Med on December 10, 2012 for follow-up care. Worker was ordered to continue physical therapy and to return to Occ Med for additional evaluation.

**{8}**     Worker again reported to Occ Med on December 20, 2012, and he was evaluated by Dr. Sandra Scher. During this visit, Dr. Scher conducted a physical evaluation and reviewed CT scans of Worker's cervical spine, thoracic spine, and lumbar spine; a CT scan of Worker's head; an MRI of Worker's cervical spine; and X-rays of Worker's thoracic spine and lumbar spine. The resulting assessment was "chronic pain, unknown at this time whether it continues to be due to fall or underlying chronic pain syndrome."

**{9}**     At this point, Worker was referred to Dr. Theresa Elliott for additional pain management. Dr. Elliott specializes in occupational medicine, chronic pain management, and interventional spine medicine. Occ Med periodically refers "complex pain patients [for whom] we can't find something identifiable" to Dr. Elliott.

**{10}**     Dr. Elliott evaluated Worker on January 9, 2013. Following review of Worker's medical records and radiologic studies, Dr. Elliott took an oral history and conducted a physical examination. Dr. Elliott diagnosed Worker with injuries, including (1) cervical strain, (2) thoracic strain, (3) lumbar strain, (4) bilateral elbow strains, and (5) preexisting cervical and lumbar pain that was "possibly aggravated" by the accident. Dr. Elliott also conducted a drug test that was positive for benzodiazepines, opioids, oxycodone, and THC. Dr. Elliott referred Worker for additional imaging studies and physical therapy.

**{11}**     Worker returned to Occ Med on January 11, 2013, and he was evaluated by Dr. Pasqualoni. Dr. Pasqualoni reviewed Worker's radiologic imaging and conducted a physical exam but was unable to determine the cause of Worker's pain. Dr. Pasqualoni did not make any additional recommendations, electing to see if Dr. Elliott's examination resulted in objective findings directly associated with Worker's accident.

**{12}**     Worker's final visit to Occ Med occurred on February 6, 2013. After a physical examination with Dr. Pasqualoni, Worker was ordered to continue physical therapy and continue pain management with Dr. Elliott. Worker was also cleared to return to work with restrictions, including no driving, climbing, or lifting items over ten pounds. Dr. Pasqualoni did not place Worker at maximum medical improvement (MMI) given her interest in the results of Worker's treatment with Dr. Elliott. Following his appointment at Occ Med, Worker was improperly ordered to undergo a drug test.[2] Worker failed to complete the drug

---

[2]The Workers' Compensation Administration's order found, as a matter of law, that "Employer violated its own policies and federal regulations by ordering Worker to undergo

3

test and was subsequently terminated. Worker's TTD and medical benefits were also terminated at that time.

**{13}** Nearly one year later, on March 4, 2014, Dr. Belyn Schwartz evaluated Worker in connection with lingering injuries associated with Worker's November 30, 2012 accident. Following a physical examination, Dr. Schwartz made various conclusions as to the causal relationship between Worker's fall and his injuries. Dr. Schwartz prescribed a course of physical therapy and anti-inflammatory medication.

**{14}** After a series of hearings, the WCJ issued a compensation order denying Worker's claims based upon a finding that Worker failed to prove causation between the November 30, 2012 accident and injuries to a reasonable degree of medical probability.

**STANDARD OF REVIEW**

**{15}** We apply whole record review to appeals of workers' compensation determinations in order to determine whether substantial evidence supports the WCJ's ruling. *Henington v. Tech. Vocational Inst.*, 2002-NMCA-025, ¶ 19, 131 N.M. 655, 41 P.3d 923. In doing so, we "view[] the evidence in the light most favorable to the agency decision, but may not view favorable evidence with total disregard to contravening evidence." *Grine v. Peabody Nat. Res.*, 2006-NMSC-031, ¶ 28, 140 N.M. 30, 139 P.3d 190 (internal quotation marks and citation omitted). After reviewing all the evidence, both favorable and unfavorable, we "disregard that which has little or no worth" and then "decide if there is substantial evidence in the whole record to support the agency's finding or decision." *Tallman v. ABF (Arkansas Best Freight)*, 1988-NMCA-091, ¶¶ 9-10, 108 N.M. 124, 767 P.2d 363.

**CAUSATION UNDER THE WORKERS' COMPENSATION ACT**

**{16}** The Workers' Compensation Act, NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2015), provides that injuries caused by on-the-job accidents are compensable if the worker proves a disability that is a "natural and direct result of the accident." Section 52-1-28(A)(3). To prove causation, the worker must present expert medical testimony by a qualified health care provider. Section 52-1-28(B).

**{17}** The testimony of a qualified health care provider must establish, to a reasonable medical probability, that a causal relationship exists between the accident and disability. *Archuleta v. Safeway Stores, Inc.*, 1986-NMCA-092, ¶ 6, 104 N.M. 769, 727 P.2d 77. The language required to convey a reasonable medical probability "need not [be offered] in positive, dogmatic language or in the exact language of the statute[,]" but it must permit "a

_____

a reasonable suspicion drug test when Employer did not have reasonable suspicion." This portion of the Workers' Compensation Administration's order has not been appealed at this time.

4

reasonable inference that the disability is the natural and direct result, as a medical probability, of the accident." *Gammon v. Ebasco Corp.*, 1965-NMSC-015, ¶¶ 22-23, 74 N.M. 789, 399 P.2d 279.

## THE WORKERS' COMPENSATION ADMINISTRATION'S ORDER DENYING BENEFITS

**{18}** Three health care providers offered opinion testimony: Dr. Sara Pasqualoni, Dr. Theresa Elliott, and Dr. Belyn Schwartz. Our administrative rules require that medical doctors testify by deposition during workers' compensation proceedings. 11.4.4.12(G)(4) NMAC (12/31/12). Based upon these three depositions, the WCJ made the following findings related to causation.

### Dr. Pasqualoni

**{19}** (1) Dr. Pasqualoni diagnosed Worker with cervical, thoracic, and lumbar strains, and a concussion; (2) Dr. Pasqualoni deferred narcotic treatment of chronic pain in Worker's upper back, neck, and shoulders to Worker's primary care physician; and (3) Dr. Pasqualoni intended to release Worker to work on February 6, 2013.

### Dr. Elliott

**{20}** (1) Dr. Elliott completed a Form Letter to Health Care Provider on March 18, 2014, indicating that Worker's cervical, thoracic, and lumbar strains are related to an on-the-job injury; (2) Dr. Elliott testified that Worker's pre-existing cervical and lumbar pain were "possibly aggravated" by the accident; (3) Dr. Elliott testified that Worker's problems are pre-existing; and (4) Dr. Elliott testified that Worker's accident "could have" aggravated his pre-existing condition.

### Dr. Schwartz

**{21}** (1) Dr. Schwartz testified that Worker's accident "likely" aggravated some underlying, degenerative process; (2) Dr. Schwartz testified that "it is very difficult to say" whether the accident caused Worker's complaints; (3) Dr. Schwartz testified "I could opine" when asked about causation; and (4) Dr. Schwartz testified that Worker's accident aggravated his pre-existing condition.

**{22}** The above findings led the WCJ to conclude that "[w]orker fail[ed] to prove by a preponderance of competent medical evidence, as required by [Section] 52-1-28, that the accident of November 30, 2012, caused Worker's condition, or aggravated a pre-existing condition."

## REOPENING OF EVIDENCE

**{23}** As a threshold matter, we must consider Employer's argument that the WCJ improperly reopened the evidence following the close of Worker's case. This matter was initially set for trial on February 5, 2014. Worker presented his case in chief and rested. During Employer's case, the WCJ elected to recess in order to allow for depositions to be taken of certain witnesses called by Employer. Worker moved to reopen his case at that time. Employer objected.

**{24}** During the recess, various motions and responses were filed, including Worker's response to Employer's motion for summary judgment, to dismiss, and for judgment as a matter of law. A medical record related to Worker's physical examination by Dr. Belyn Schwartz on March 4, 2014 was attached to this response. In a hearing on March 24, 2014, Employer opposed the admission of documents that did not exist at the time of the initial trial, arguing that admission would amount to a new trial.

**{25}** The WCJ, relying on 11.4.4.12(L)(5) NMAC (12/31/2012), ordered that discovery be reopened "in the interests of justice" and in accordance with the New Mexico Administrative Code and New Mexico Rules of Civil Procedure. "[A] court may re-open the evidence in a case at its discretion." *DiMatteo v. Doña Ana Cty.*, 1985-NMCA-099, ¶ 27, 104 N.M. 599, 725 P.2d 575. However, it is also "well settled that a motion to reopen must cross a threshold of showing a good reason for the requesting party not presenting its case at the first hearing." *State v. McClaugherty*, 2007-NMCA-041, ¶ 57, 141 N.M. 468, 157 P.3d 33 (Kennedy, J., concurring in part and dissenting in part). In this case, our review of the hearing transcript reveals that the "interests of justice" are triggered by allegations of discovery abuses or violations by Worker. *See* 11.4.4.12(L)(5) NMAC (12/31/2012) ("Under exceptional circumstances and in the interest of justice, within ten (10) days of the close of the adjudication hearing, the judge has discretion to direct or allow supplementation of evidence.").

**{26}** Given established precedent granting broad discretion to trial courts in similar circumstances, the WCJ's determination to reopen this case for the purpose of admitting additional evidence did not constitute an abuse of discretion in this case. *See Foreman v. Myers*, 1968-NMSC-138, ¶ 17, 79 N.M. 404, 444 P.2d 589 (holding that a trial court's determination to reopen a case is "within the sound discretion of the trial court and will not be lightly overturned.").

## BALANCING OF ADMISSIBLE DEPOSITION TESTIMONY

**{27}** Our standard of review requires that the expert witness testimony be balanced to determine "if there is substantial evidence in the whole record to support the agency's finding or decision." *Tallman*, 1988-NMCA-091, ¶ 10. The *Tallman* Court discussed *McMillian v. Schweiker*, 697 F.2d 215 (8th Cir. 1983), as an example of when an administrative determination is not supported by substantial evidence. *Tallman*, 1988-NMCA-091, ¶ 10.

6

**{28}** In *McMillian*, the appellant suffered a stroke and was diagnosed with a brain tumor. 697 F.2d at 217. Following his surgery, the appellant applied for social security disability based on symptoms including difficulty walking, difficulty using his left hand, fatigue after physical exertion, difficulty concentrating, and recurring headaches. *Id.* at 218. At his disability determination hearing, the appellant presented expert testimony from five health care providers. This testimony included: (1) opinions from two doctors that the appellant was "totally and permanently disabled;" (2) an opinion from a third doctor that the appellant was "prevented from engaging in full time employment;" and (3) opinions from two additional doctors that discussed medical findings but failed to offer opinions as to the appellant's ability to return to the workforce in any capacity. *Id.* at 218-19. Additional testimony was offered by the appellant's witnesses, including his wife, friends, and former co-workers, as well as additional expert testimony by a vocational expert. *Id.* at 219. The administrative law judge (ALJ), relying "principally" on the testimony of the vocational expert, found that the appellant's physical limitations "would not preclude the performance of sedentary job activity[.]" *Id.* at 219-20 (internal quotation marks and citation omitted). This determination was upheld by the district court but was reversed by the Eighth Circuit. *Id.* at 217. In reversing, the court noted that "nothing in the medical reports specifically contradicts [the appellant's] complaints of difficulty in concentration and fatigue[,]" and that the ALJ's finding "discredited" the appellant's physical complaints and departed from the medical evidence. *Id.* at 221. ("[T]he medical reports reveal that three examining physicians . . . concluded that [the appellant] could not engage in substantial gainful employment due to his stroke and brain surgery, while the two other examining physicians refrained from expressing an opinion on the matter.").

**{29}** The present case is largely analogous to *McMillian*. Both cases examine agency decisions that are predicated largely on expert testimony by health care providers. Both cases examine whether the agency determination was supported by substantial evidence. In *McMillian*, the court held that the ALJ's ruling was not supported by the vocational or medical evidence. By implication, the court determined that medical testimony that fails to offer an opinion as to an ultimate issue is merely balanced against less equivocal testimony. *Id.* ("[T]he cursory observation made by two examining physicians that [the appellant's] mental and verbal functions 'were not visibly abnormal' does not detract from [the appellant's] complaint of difficulty in concentration.").

**{30}** In the present case, Worker was involved in an on-the-job accident on November 30, 2012 and, at least as recently as March 4, 2014, had pain in his lower back, left shoulder, and extremities that he attributes to the accident. Expert testimony was offered by Drs. Elliott, Pasqualoni, and Schwartz for the purpose of establishing whether a causal relationship existed between Worker's accident and injuries. *See* § 52-1-28(A). We review the testimony of each doctor to determine whether substantial evidence supports the WCJ's determination.

**The Deposition Testimony of Dr. Elliott**

**{31}** Dr. Elliott examined Worker on January 9, 2013, and her deposition testimony was

7

taken on two separate occasions: January 30, 2014, and May 27, 2014. On January 30, 2014, she testified:

> Q: What were your diagnoses?
>
> A: There were five, well, basically four: cervical strain; No. 2, thoracic strain; No. 3, lumbar strain; No. 4, bilateral elbow strains with questionable ulnar neuritis. And then the fifth impression was preexisting cervical and lumbar pain, possibly aggravated.
>
> Q: With regard to all five of those, were you able to come to an opinion as to the cause of those diagnoses or whether they were preexisting?
>
> A: Well, as I said, the only thing that I mentioned was preexisting was the cervical and lumbar pain, and I felt that it was possibly aggravated.

Dr. Elliott repeated these diagnoses in her second deposition, in which she testified:

> Q: [In] your deposition, you gave some diagnoses to a reasonable degree of medical probability . . . .
>
> A: Yes. I stated that there were four to five diagnoses, one was his cervical strain, number two was a thoracic strain, number three was a lumbar strain, number four was bilateral elbow strain with questionable ulnar neuritis, and the fifth impression was preexisting cervical and lumbar pain, possibly aggravated.
>
> . . . .
>
> Q: And the only condition you felt might be preexisting was the cervical and lumbar pain possibly aggravated?
>
> A: That is correct.

Dr. Elliott went on to testify,

> Q: Do you feel confident based on what you saw on January 9 [, 2013] to render the opinions that you rendered in your deposition?
>
> . . . .
>
> A: If you're asking me if I still uphold all of my opinions that I stated in my original deposition, yes, I do.

8

Q:      And it's your opinion that [Worker] did suffer a work-related injury and various medical conditions resulting from that fall?

A:      Correct.

Additionally, on March 18, 2014, Dr. Elliott answered "yes" and signed the form letter referenced, though incompletely, in the WCJ's compensation order, which stated:

> In your opinion, are the conditions or complaints for which you have treated the Worker causally related to an on-the-job injury . . . based upon a reasonable medical probability?

**{32}** The WCJ's order downplayed both the unequivocal nature of the March 18, 2014 form letter and the substance of the above quoted testimony. Instead, the WCJ's order focused on more equivocal portions of Dr. Elliott's testimony that relate exclusively to Worker's pre-existing cervical and lumbar pain. For example, Dr. Elliott testified that Worker's pre-existing cervical and lumbar pain was "possibly aggravated" by the accident. Dr. Elliott also testified that a fall from a scaffolding "could have" aggravated pre-existing back pain. These comments do not, however, indicate that the newly diagnosed injuries, including cervical strain, thoracic strain, lumbar strain, and bilateral elbow strain were pre-existing or merely aggravated by Worker's accident. In the workers' compensation context, a health care provider must be allowed to equivocate with respect to certain injuries about which he or she is unsure as to causation while still offering positive statements as to others. A contrary holding would set up an all-or-nothing requirement for health care providers making causation determinations. To elaborate, by way of example, a health care provider can testify that a causal relationship exists between a workplace accident and a worker's concussion but that he or she is unsure as to whether a causal relationship exists with respect to the same accident and the worker's sprained ankle. The lack of certainty as to the second injury does not negate the certainty as to the first.

**{33}** This is the scenario that played out here. Worker was referred to Dr. Elliott following initial treatment at Occ Med. Dr. Elliott reviewed Worker's medical history and conducted a physical exam. She noted that he had pre-existing cervical and lumbar pain. This pre-existing pain did not prevent Worker from completing daily tasks. Because Worker claimed that he could no longer perform daily tasks after the November 30, 2012 accident, Dr. Elliott presumably attributed the injuries Worker complained of and his inability to complete daily tasks to that accident.

**{34}** Dr. Elliott's inability to determine to a reasonable medical probability whether Worker's fall aggravated pre-existing injuries is largely immaterial to this analysis. Dr. Elliott diagnosed Worker with four "new" injuries after the November 30, 2012 accident. She did so to a reasonable medical probability. Whether Worker's fall "possibly" or "could have" aggravated pre-existing injuries *in addition* to causing Worker's cervical, thoracic, lumbar, and bilateral elbow strains does not logically lead to the WCJ's conclusion that all

9

of "Worker's problems are pre-existing."

{35}     During her deposition, Dr. Elliott was asked whether it was possible that diagnoses one through four were entirely pre-existing, to which she answered, "It's possible, yes." Employer seizes upon this point as an example of equivocation by Dr. Elliott on the matter of causation. We disagree. The statement does not represent acceptance of the premise; it merely reflects acknowledgment of the possibility that the injuries are pre-existing. The statement is not sufficient to negate the clear assertions of causation previously discussed. *See White v. Land Valley Co.*, 1957-NMSC-100, ¶ 14, 64 N.M. 9, 322 P.2d 707 ("[T]he verdict must rest upon probabilities and not upon mere speculation, conjecture, surmise, or bare possibilities[.]"), *overruled in part by Mascarenas v. Kennedy*, 1964-NMSC-179, 74 N.M. 665, 397 P.2d 312.

{36}     In summary, Dr. Elliott's testimony provides clear evidence of causation to a reasonable degree of medical probability between Worker's November 30, 2012 accident and diagnosed injuries including (1) cervical strain; (2) thoracic strain; (3) lumbar strain; and (4) bilateral elbow strain. Dr. Elliott's testimony does not provide evidence of causation to a reasonable degree of medical probability as to (1) any aggravation of pre-existing cervical or lumbar pain, or (2) any injuries caused by Worker's secondary fall at Occ Med on December 3, 2012.

**The Deposition Testimony of Dr. Pasqualoni**

{37}     Dr. Pasqualoni's testimony is difficult to reconcile, in part, because neither party actually posed to her a question about causation to a reasonable medical probability. While Occ Med providers diagnosed Worker with numerous injuries and treated Worker for them, nowhere in Dr. Pasqualoni's 107-page deposition does she positively affirm or deny that Worker's injuries were causally related to the November 30, 2012 accident to a reasonable medical probability.

{38}     During Worker's December 3, 2012 appointment at Occ Med, Dr. Pasqualoni diagnosed Worker with a concussion; cervical, thoracic, and lumbar strains; chronic pain syndrome; and elevated blood pressure. Dr. Pasqualoni further testified that Worker's chronic pain was centralized in his neck, shoulders, and upper back. Additionally, Dr. Pasqualoni adopted the diagnoses of Los Alamos Medical Center staff that included muscular back pain and spasms and chronic myofascial neck pain and shoulder pain. These diagnoses, when viewed in the aggregate, indicate a combination of new injuries and chronic pain. In an attempt to resolve these dual diagnoses, Dr. Pasqualoni and Occ Med staff debated whether Worker's specific complaints were causally related to the November 30, 2012 accident or were the result of pre-existing chronic pain. Relevant excerpts from Dr. Pasqualoni's deposition highlighting this debate include the following:

> Q:     Can you tell us what Dr. Scher found in her notes in terms of [Worker's] condition? . . .

A:      So she, doing his exam and reviewing all of his radiologic studies, basically puts in her Assessment "chronic pain, unknown at this time whether it continues to be due to fall or underlying chronic pain syndrome[.]"

. . . .

Q:      Based on your treatment of [Worker], your clinical training as an occupational provider, and the last time you saw him, same question, would an I[ndependent] M[edical] E[xam] be helpful[?] . . .

A:      I believe that a chronic pain specialist would be the best person to do the IME, because it's very complex differentiating between [Worker's] underlying chronic pain syndrome, which is the fibromyalgia, and whatever injury [Worker] incurred when he fell off the scaffold.

Similarly, when asked to explain how Worker's symptoms and radiologic studies conform with her medical expectations, Dr. Pasqualoni stated the following:

Q:      Could those findings account for some of the numbness and paresthesias he felt in his arms? . . .

A:      So, in general, the thecal sac effacement should not cause any symptoms or paresthesia, so it should not cause any neurologic deficits. . . . So on the thoracic spine, there was no canal or foraminal stenosis. And if you're talking about arm numbness and tingling, usually it's going to be lower cervical, upper thoracic spine that would account for those symptoms. . . . The cervical spine, there was no canal or foraminal stenosis.

Q:      Okay. But there is disc protrusions in the thoracic spine that efface the thecal sac. . . . And you're saying that that does not ever cause numbness in the arms.

A:      It should not. . . .

Q:      So you're saying that under no circumstances mild effacement of thecal sacs does not affect the pressure on the nerve.

A:      No, not unless it's concurrent with canal stenosis, as well.

Q:      All right. So let's look at the cervical, . . .

11

A:     So he had a mild annular bulge at C3-4, smaller bulges at C4-5 and C5-6, and he had facet arthropathy at C5-6, no resulting spinal stenosis or neural foraminal narrowing.

Q:     Would any of those conditions, mild annular bulges or regular bulges or facet arthropathy, cause numbness or paresthesia in his hands and arms?

A:     Not without stenosis.

Q:     So those findings in no way explained why he has some numbness in his arms and shoulders?

A:     No.

We are in no position to question Dr. Pasqualoni's conclusions about Worker's radiological image studies. At the same time, we are compelled to note that none of her testimony states that Worker's accident was not causally related to the numbness in Worker's arms and shoulders, or other complained of symptoms. Dr. Pasqualoni's testimony also fails to indicate, or establish to a reasonable medical probability, that Worker's symptoms are somehow related to a chronic or pre-existing injury.

**{39}**     As the Eighth Circuit did in *McMillian*, this Court declines to give substantial weight to expert opinion testimony that fails to speak to the ultimate issue in the case. *See Tallman*, 1988-NMCA-091, ¶ 9 (holding that a whole record review empowers appellate courts to "analyze and examine all the evidence and disregard that which has little or no worth"). As such, Dr. Pasqualoni's testimony failed to provide a medical opinion as to causation that is sufficient to (1) contradict the opinion of Dr. Elliott, or (2) independently support the WCJ's determination.

**{40}**     We further note that Dr. Pasqualoni's testimony did not factor significantly in the WCJ's order in this case. The WCJ made only four findings based on Dr. Pasqualoni's testimony, and two of those related to Worker's previous prescription drug regimen. The other two findings outline Dr. Pasqualoni's (1) initial diagnoses and (2) clearance for Worker to resume employment. Given the breadth of Dr. Pasqualoni's testimony, we presume that the absence of findings based upon Dr. Pasqualoni's testimony in the WCJ's order is correlated with the absence of positive statements as to causation in her deposition.

**The Deposition Testimony of Dr. Schwartz**

**{41}**     Dr. Schwartz examined Worker on two occasions beginning in March of 2014 and was deposed on May 20, 2014. Relevant excerpts of Dr. Schwartz's deposition testimony include the following:

Q:      If you could just give me your opinion on which diagnoses you believe are causally related to the [November 30, 2012] alleged industrial accident.

A:      So in my general take on what I think happened, I think he has increased or additional low back pain following this fall injury on November 30, 2012. It is my sense that he likely aggravated some underlying degenerative process that was already at play and/or injured some soft tissues in his low back, sometimes referred to as a strain injury; but the concept of additional low back pain, I believe, is a result of this fall. He also had chronic neck pain that I did not attribute to this, and his overweight status I do not attribute to this.

Q:      So the one diagnosis you causally relate to the 2012 accident is a strain to the low back?

A:      Strain and likely aggravation of degenerative disc disease of the lumbar spine.

  . . . .

Q:      [T]o a reasonable degree of medical probability based on your review of the medical records and your examination of [Worker], do you believe he aggravated any preexisting condition as a result of this fall off a scaffold on November 30, 2012?

A:      It's very difficult to say that to a reasonable degree of medical probability given information alluded to in the context of this deposition with preexisting issues that I have not [been] able to review whatsover. By his reporting, he was functional and able to work consistently, and since his accident, due to back pain, he is not able to. So from his reporting and the scant records that I did have, I would say that I could opine that, but more questions have been raised[.]

. . . .

Q:      Would you have any reason to disagree with [the] assessment done by Dr. Elliott on January 9, 2013? . . . .

A:      No, I have no reason to disagree with Dr. Elliott's assessment at that time.

As discussed above, Dr. Elliott's testimony states, to a reasonable degree of medical

13

probability, that a causal relationship exists between Worker's diagnosed conditions, including (1) cervical strain, (2) thoracic strain, (3) lumbar strain, and (4) bilateral elbow strain with questionable ulnar neuritis. Dr. Schwartz's testimony appears consistent with respect to these injuries. Additionally, Dr. Elliott noted pre-existing cervical and lumbar pain, which was possibly aggravated by Worker's accident. We have already concluded that Dr. Elliott's testimony does not establish, to a reasonable degree of medical probability, that Worker's accident was causally related to the aggravation of pre-existing back injuries. Therefore, we must determine whether Dr. Schwartz's testimony does establish a causal relationship in this regard.

**{42}** The testimony of a medical provider must establish, to a reasonable medical probability, that a workplace accident and injuries claimed are causally related. *Gammon*, 1965-NMSC-015, ¶ 22. Dr. Schwartz's testimony presents a somewhat unique twist on conventional analysis in this area given that her testimony appeared to shift during the course of the deposition.

**{43}** Dr. Schwartz's testimony begins with a relatively certain pronouncement that Worker's accident resulted in "[s]train[s] and likely aggravation of degenerative disc disease of the lumbar spine." However, over the course of her testimony, Dr. Schwartz was confronted by Employer's counsel with information related to numerous prior injuries to Worker's neck and back about which Dr. Schwartz was apparently unaware.[3] After being confronted with this information, Dr. Schwartz was again asked whether Worker's accident and the aggravation of pre-existing injuries were causally related. At this time, Dr. Schwartz conceded that "[i]t's very difficult to say that to a reasonable degree of medical probability" that Worker's accident and injuries are causally related.

**{44}** Review of our workers' compensation jurisprudence related to this issue indicates that Dr. Schwartz's equivocation during the deposition supports the WCJ's determination that her testimony does not indicate a causal relationship between accident and injury to a reasonable medical probability. *See, e.g., Montano v. Saavedra*, 1962-NMSC-095, ¶ 9, 70 N.M. 332, 373 P.2d 824 (affirming a denial of compensation when the expert witness "admitted it would be difficult to say with any degree of probability" that claimant's condition at the time of trial was probably caused by the accident); *Renfro v. San Juan Hosp., Inc.*, 1965-NMSC-067, ¶ 9, 75 N.M. 235, 403 P.2d 681 (affirming a denial of compensation when the expert witness testimony "only establishes that the fall could, rather than that it did, as a medical probability, cause the disability"). Absent unequivocal and

---

[3]Various lines of questioning by Employer's counsel during Dr. Schwartz's deposition clearly contemplate a *Neiderstadt* challenge to Dr. Schwartz's expert opinions. *See Niederstadt v. Ancho Rico Consol. Mines*, 1975-NMCA-059, ¶ 11, 88 N.M. 48, 536 P.2d 1104. Because this argument was not specifically made on appeal, we decline to apply the analysis sua sponte. *See Kreischer v. Armijo*, 1994-NMCA-118, ¶ 10, 118 N.M. 671, 884 P.2d 827 (declining to review issues not raised in appellate briefing).

uncontradicted testimony establishing causation, a workers' compensation judge is charged with weighing expert witness opinion. *Montano*, 1962-NMSC-095, ¶ 13. Because Dr. Schwartz's testimony does not establish causation to a reasonable medical probability, we find no error in the WCJ's determination as to the persuasiveness of Dr. Schwartz's testimony.

## LACK OF SUFFICIENT EVIDENCE SUPPORTING WORKERS' COMPENSATION ADMINISTRATION'S ORDER

**{45}** When undertaking whole record review, this Court is not empowered to choose "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*," and we have not done so here. *Tallman*, 1988-NMCA-091, ¶ 14 (internal quotation marks and citation omitted). We are well-aware of the difficult position in which our systemic legal requirements place medical practitioners. *See, e.g.*, *Renfro*, 1965-NMSC-067, ¶ 13 ("An examination of the medical testimony in its entirety, *even recognizing the natural reluctance of a medical expert to make positive statements*, fails to reveal testimony which requires . . . that as a medical probability the disability of the appellant was the natural and direct result of the fall." (Emphasis added)). However, Dr. Pasqualoni's testimony simply cannot be read to offer an opinion, to a reasonable degree of medical probability, as to the nature of the relationship, if any, between Worker's accident and injuries. *See Tallman*, 1988-NMCA-091, ¶ 16 ("While the administrative agency's findings are entitled to respect, they must nonetheless be set aside when the record before the reviewing court clearly precludes the agency's decision from being justified by a fair estimate of the worth of the testimony of witnesses[.]" (internal quotation marks and citation omitted)).

## CONCLUSION

**{46}** Dr. Elliott's testimony indicates the existence of a causal relationship between Worker's accidental fall of November 30, 2012 and his cervical, thoracic, lumbar, and bilateral elbow strains. Dr. Pasqualoni's testimony neither confirms nor denies a causal relationship. As a result, the WCJ's ruling is not supported by substantial evidence.[4]

**{47}** We therefore remand this case to the Workers' Compensation Administration for additional evaluation of Worker's entitlement to TTD and medical benefits in light of this opinion.

---

[4] The WCJ's conclusions of law applied only to causation. It is unclear to us whether Workers' injuries resulted in a disability as required to trigger compensation under our workers' compensation statute. *See Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 22, 137 N.M. 497, 113 P.3d 320 ("Compensation is paid only when a work-related accidental injury becomes disabling." (alteration, internal quotation marks, and citation omitted)). The parties have not briefed this matter, and we decline to surmise.

**{48}    IT IS SO ORDERED.**

                                       _____

                                       **JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**M. MONICA ZAMORA, Judge**

_____

**J. MILES HANISEE, Judge**